## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

ASCENT AEROSYSTEMS INC.,
    *Plaintiff,*

      v.                      No. 3:24-cv-1075 (OAW)

JEFFREY T. HILL, ET AL.
    *Defendants.*

## <u>ORDER</u>

This is a breach of contract and trade secret misappropriation dispute between Plaintiff, Ascent Aerosystems Inc., and Defendants Overwatch Aerospace LLC, Overwatch Aerospace Ltd., and Overwerx Ltd. ("Overwerx") (collectively "the Corporate Defendants"), and Jeffrey Hill and Andrew Michael (collectively "the Individual Defendants"). Plaintiff was in a business relationship with Defendant Hill and his company, the now-dissolved Overwatch Defense, between 2017 and 2018. Compl. ¶¶ 37–42, ECF No. 1. After this relationship ended, Defendants allegedly misappropriated Plaintiff's proprietary unmanned aerial vehicle ("UAV") technology. *Id.* ¶¶ 49–55.

On December 23, 2024, the court directed the parties to submit briefing on the transfer of this action to the Northern District of New York. ECF No. 75. The court has reviewed the complaint, ECF No. 1, Defendants' motion to dismiss, ECF No. 47, Plaintiff's opposition thereto, Mem. of Law in Opp'n, Defendants' reply in support of the motion to dismiss, ECF No. 62, Defendants' objection to transfer, ECF No. 76, Plaintiff's response thereto, ECF No. 77, Defendants' motion to strike Plaintiff's response, ECF No. 78, and the record in this case. For the reasons discussed herein, this action is **TRANSFERRED** to the Northern District of New York.

1

I.    **BACKGROUND**

This section focuses solely on the factual and procedural background necessary to determine the question of transfer:

Plaintiff is an aerospace company that specializes in designing, making, and selling UAVs, otherwise known as drones.  Compl. ¶ 4.  It was founded in 2014 by Peter Fuchs, Nathaniel Meringer, and Jonathan Meringer.  Decl. of Pl.'s Founders ¶ 3, ECF No. 8-3.  Since the company's founding, Mr. Fuchs has been the CEO, Nathaniel Meringer has been the Chief Engineer, and Jonathan Meringer has been the Chief Technology Officer.  *Id.*  Plaintiff is a Delaware Corporation with a principal place of business in Wilmington, Massachusetts.  Compl. ¶¶ 1–3.  In 2017 and 2018, its principal place of business was in Syracuse, New York.  CTA, Ex. A at 2, ECF No. 8-5.

In or about September 2017, Defendant Hill initiated communications with Plaintiff on behalf of his company Overwatch Optics, to inquire about Plaintiff's drone technology.  Compl. ¶ 32.  Defendant Hill is a resident of Fredericksburg, Virginia, though at the time he engaged in business dealings with Plaintiff, he resided in Florida.  First Decl. of Hill ¶¶ 4, 15, ECF No. 47-38.  Hill founded and was the sole owner of Overwatch Optics, LLC and the now-dissolved Overwatch Defense, LLC.  *Id.* ¶¶ 8, 10.  Both entities were Florida corporations with principal places of business at Hill's residence in Davenport, Florida.  Compl. ¶¶ 7–8.

On or around September 27, 2017, Plaintiff entered into a Mutual Non-Disclosure Agreement ("NDA") with Hill's company, Overwatch Optics.  NDA, Ex. B at 5, ECF No. 8-6.  The NDA was agreed to before Defendant Hill founded Overwatch Defense and was "for the purposes of exploring a business collaboration with Ascent."  First Decl. of Hill ¶

2

9.  Within a week of signing the NDA on Overwatch Optic's behalf, Hill founded Overwatch Defense.  *Id.* ¶ 10.  Hill clarified that, instead of Overwatch Optics, Overwatch Defense "took the collaboration forward with [Plaintiff]."  *Id.*

On or about November 12, 2017, Plaintiff and Overwatch Defense entered into the Commercial Teaming Agreement ("CTA"), wherein the parties agreed to jointly pursue the development of a weaponized UAV referred to as the PHOLOS Kinetic UAS Coaxial Weapon System.  *See* CTA at 7–8.  The CTA stated in relevant part: "[t]he Parties agree to be bound by the terms of the existing Non-Disclosure Agreement between the parties, dated 27 September 2017."  *Id.* at 4–5.  Pursuant to the CTA, Plaintiff shared confidential and proprietary trade secret information with, and transmitted equipment to, Overwatch Defense and the Individual Defendants.  Compl. ¶¶ 38–40.

Defendant Michael, a citizen of the United Kingdom, played a role in the teaming agreement, though the extent of his involvement is disputed.  *See* Compl. ¶ 14.  Plaintiff alleges he was the Chief Operating Officer of Overwatch Defense and exercised significant control over the company's transactions.  *See id.* ¶¶ 14, 63.  It claims that it sent confidential and proprietary information and equipment to Defendant Michael in addition to Defendant Hill and Overwatch Defense.  *See id.* ¶¶ 38–40.  In contrast, Defendant Hill says that Defendant Michael "at no time," was "an owner, officer or employee of [Overwatch Defense]."  First Decl. of Hill ¶ 13.  For his part, Defendant Michael alleges that this his role as COO "was a title in name only" in order to lend "gravitas" to Overwatch Defense while it interfaced with "potential customers."  First Decl. of Michael ¶ 25, ECF No. 47-2.  All of the parties agree that on or about October 16, 2018, both Defendant Hill and Defendant Michael met with Plaintiff's founders and CEO in

Syracuse, NY.  Mem. of Law in Supp. of Defs.' Mot. to Dismiss 14, ECF No. 47-1 ("Mem. of Law").

        After failed negotiations to establish a licensing agreement, Plaintiff terminated the CTA in November 2018, and in turn demanded the return of its information and equipment from Overwatch Defense.  Compl. ¶¶ 41–43.  Plaintiff alleges that Overwatch Defense rejected its requests, prompting Plaintiff to file a civil action in this court in February 2019.  *Id.* ¶¶ 44–45; *see Ascent AeroSystems Inc. v. Overwatch Defense LLC*, Civil Action No. 3:19-cv-00210 (KAD), (D. Conn. Feb. 12, 2019).  Soon after, the parties reached a settlement because Overwatch Defense agreed to "return all of [Plaintiff's] equipment except for one drone that was allegedly destroyed," to not use any information it acquired from Plaintiff, and to not infringe on Plaintiff's patent.  *See* Compl. ¶ 46.

        The following year, in January 2020, Defendant Overwerx was incorporated under the laws of the United Kingdom.  *Id.* ¶ 10.  Defendant Michael is the CEO of Overwerx, which wholly owns Defendant Overwatch Aerospace Ltd., which in turn wholly owns Defendant Overwatch Aerospace LLC.  First Decl. of Michael ¶ 5.  Plaintiff alleges that Defendant Hill is a "founder, shareholder, and former director," of Overwerx.  Compl. ¶ 10.  Defendants, however, dispute the nature of Defendant Hill's involvement with Overwerx.  *See* Mem. of Law at 20.  For example, Defendant Hill states that "[w]hilst Mr. Hill did become a statutory director in Overwerx Ltd, it was not an executive role and could at best be considered a non-executive position with no executive or management responsibilities whatsoever."  First Decl. of Michael ¶ 132.  In any event, the parties agree that Defendant Hill engineered the transfer of Overwatch Defense's patents to Overwerx

in exchange for his receipt of "42% of the stock in Overwerx." *Id.* ¶ 131; Compl. ¶ 49.   In September 2020, Overwatch Defense was dissolved.  Compl. ¶ 50.

Overwerx's wholly owned subsidiary, Defendant Overwatch Aerospace Ltd., is a U.K. company which is "in the business of designing, making and selling" UAVs.  First Decl. of Michael ¶ 7.   Defendant Michael is its CEO, *id.*, and Plaintiff alleges that Defendant Hill "holds himself out as a founder and full-time employee," Compl. ¶ 12, though Defendants dispute this characterization, First Decl. of Michael ¶ 133.

Defendant Overwatch Aerospace LLC is a Florida company that was formed in August 2021 with both individual defendants serving as managers, and Defendant Hill individually serving as a consultant "for the principal purpose of ensuring a successful outcome in the final steps with the US Patent Office in respect of the award of the [Overwatch Defense] Patents."  First Decl. of Michael ¶¶ 8, 134.  Defendant Hill has since resigned as manager.  *Id.*

On June 21, 2024, Plaintiff filed this action in the District of Connecticut, alleging breach of contract, trade secret misappropriation, inventorship correction, and unfair and deceptive trade practices in violation of Connecticut law.  *See generally* Compl.  Plaintiff also filed a motion for preliminary injunction, petitioning the court to enjoin Defendants from using or disclosing Ascent's confidential, proprietary, and trade secret information related to its UAV technology.  *See* ECF No. 8.

Defendants subsequently filed a motion to dismiss pursuant to Federal Rule 12(b)(2), for lack of personal jurisdiction over all defendants, Rule 12(b)(3), for improper venue, Rule 12(b)(6), for failure to state a claim upon which relief can be granted as to

Counts Two, Three, and Four in the complaint, and Rule 12(b)(1), for lack of subject matter jurisdiction as to Count 4.  *See* Mem. of Law at 1–2.

On December 23, 2024, the court directed the parties to submit briefing on the possible transfer of this action to the Northern District of New York.  ECF No. 75. Defendants filed a response to the court's order, objecting to transfer.  ECF No. 76. Plaintiff filed response thereto, arguing that transfer is permissible.  ECF No. 77. Defendants then filed a motion to strike Plaintiff's response.  ECF No. 78.

## II.   <u>LEGAL STANDARD</u>

Courts may transfer suits under 28 U.S.C. § 1404(a) or § 1406(a) upon motion by either party or *sua sponte*.  *See Lead Indus. Ass'n, Inc. v. Occupational Safety & Health Admin.*, 610 F.2d 70, 79 n.17 (2d Cir.1979) ("The broad language of 28 U.S.C. § 1404(a) would seem to permit a court to order transfer sua sponte"); *Concession Consultants, Inc. v. Mirisch*, 355 F.2d 369, 371–72 n.3 (2d Cir.1966) ("where the motion asks only that the suit be dismissed, the court may properly, sua sponte, order it transferred [under 28 U.S.C. § 1406(a)]").  In cases where the court proposes transfer *sua sponte*, "parties should be provided notice and an opportunity to be heard."  *Unlimited Care, Inc. v. Visiting Nurse Ass'n of E. Massachusetts, Inc.*, 42 F. Supp. 2d 327, 333 n.4 (S.D.N.Y. 1999).

A matter may be transferred to "any district or division in which it could have been brought," if it is "in the interest of justice."  *See* 28 U.S.C. §§ 1404(a), 1406(a).  Therefore, jurisdiction and venue must be proper in the transferee court.  *Jones v. City of New York*, No. 11-cv-5042, 2012 WL 716890, at *1 (E.D.N.Y. Mar. 5, 2012).

While the transferee court must exercise personal jurisdiction over the defendants, a transferring court may send a case to another judicial district "whether or not [it] has personal jurisdiction over the defendant[s]," pursuant to 28 U.S.C. § 1406(a). *WorldCare Corp. v. World Ins. Co.*, 767 F. Supp. 2d 341, 364–65 (D. Conn. 2011) ("The language of § 1406(a) is amply broad enough to authorize the transfer of cases, however wrong the plaintiff may have been in filing his case as to venue, whether the court in which it was filed had personal jurisdiction over the defendants or not." (quoting *Goldlawr, Inc. v. Heiman*, 369 U.S. 463, 466, (1962))); *SongByrd, Inc. v. Estate of Grossman*, 206 F.3d 172, 179 n.9 (2d Cir.2000) (lack of personal jurisdiction can be cured by transfer to a district in which personal jurisdiction can be exercised, under either section 1406(a) or section 1404(a)).

Indeed, "[t]ransfer is favored to remove procedural obstacles including the lack of personal jurisdiction." *WorldCare Corp.*, 767 F. Supp. 2d at 365; *Minnette v. Time Warner*, 997 F.2d 1023, 1027 (2d Cir. 1993) ("the functional purpose of 28 U.S.C. § 1406(a) is to eliminate impediments to the timely disposition of cases and controversies on their merits"). Thus, if the court finds that it cannot exercise personal jurisdiction over Defendants, it is in the interest of justice to transfer the matter to a forum that can.

## III.   DISCUSSION

### A.   Jurisdiction and Venue in the District of Connecticut

Determining whether this court has personal jurisdiction over Defendants dictates whether transfer is appropriate under § 1404(a) or § 1406(a). Defendants argue that this court lacks personal jurisdiction over all defendants and seeks dismissal under Federal

Rule of Civil Procedure 12(b)(2).  Mem. of Law at 2.  Plaintiff counters that this court may exercise personal jurisdiction over the Corporate Defendants through a theory of personal jurisdiction by way of successor liability and over the Individual Defendants because they are subject to Connecticut's long-arm statute and because there are minimum contacts. Pl.'s Mem. of Law in Opp'n to Defs.' Mot. to Dismiss 6–8, 15, ECF No. 54 ("Mem. of Law in Opp'n").

The court first considers personal jurisdiction over the Corporate Defendants. Plaintiff does not argue that this court has personal jurisdiction over the Corporate Defendants because they have minimum contacts with the forum and Connecticut's long-arm statute applies to them. Rather, Plaintiff argues that this court may exercise personal jurisdiction over them because they are "successors-in-interest" and "closely related" to Overwatch Defense, which waived objections to personal jurisdiction because it agreed to the CTA, which incorporated the NDA's forum selection clause designating Connecticut as the proper forum to resolve disputes.[1]  *See id.* at 15–18.  Plaintiff thus argues that the forum selection clause applies in equal force to the Corporate Defendants for purposes of personal jurisdiction, even though they were not parties to the CTA or NDA.  *See id.*

To support this proposition, Plaintiff relies primarily on *Aguas Lenders Recovery Grp. v. Suez*, S.A., 585 F.3d 696 (2d Cir. 2009).  It argues that the Second Circuit has affirmed "that the successor-in-interest doctrine prevents entities from using formalistic means to evade their contractual obligations," including forum selection provisions.  Mem. of Law in Opp'n at 15 (citing *Aguas Lenders*, 585 F.3d at 700).  Thus, "a successor cannot

---

[1] Defendants argue that the CTA does not incorporate the NDA's forum selection clause, and that the clause is permissive.  Mem. of Law at 17–18.  The court does not address these questions because their resolution does not affect the outcome of this transfer order.

escape enforcement of such a clause by claiming nonparticipation in the original agreement."  *Id.* at 16.  Plaintiff also argues that *Aguas Lenders* supports the conclusion that "forum selection clauses may be enforced against non-signatories who are 'closely related' to the signatory or the underlying dispute."  *Id.* at 17.

It is true that this court can exercise personal jurisdiction over a party by way of successor liability.  In *LiButti v. United States*, 178 F.3d 114, 123 (2d Cir. 1999), the Second Circuit held that "when a person is found to be a successor in interest, the court gains personal jurisdiction over them simply as a consequence of their status as a successor in interest, without regard to whether they had any other minimum contacts with the state."  However, under this attenuated approach to personal jurisdiction, the entity to which a party is a successor typically has minimum contacts with the forum.  In other words, the predecessor is subject to personal jurisdiction not through waiver, but because it had minimum contacts with the forum.  *See Call Ctr. Techs., Inc. v. Grand Adventures Tour & Travel Pub. Corp.*, 2 F. Supp. 3d 192, *216–17 (D. Conn. 2014), *aff'd sub nom. Call Ctr. Techs., Inc. v. Interline Travel & Tour, Inc.*, 622 F. App'x 73 (2d Cir. 2015) (exercising personal jurisdiction over an entity with successor liability because Connecticut's long-arm statute and due process requirements would grant personal jurisdiction over predecessor company); *see Fly Shoes s.r.l. v. Bettye Muller Designs Inc.*, No. 14 CIV. 10078 (LLS), 2015 WL 4092392, at *2 (S.D.N.Y. July 6, 2015) (exercising personal jurisdiction over an entity with successor liability because the predecessor was incorporated in the state and therefore subject to personal jurisdiction); *but see Time Warner Cable, Inc. v. Networks Grp., LLC*, No. 09 CIV 10059 DLC, 2010 WL 3563111, at

*6 (S.D.N.Y. Sept. 9, 2010) (exercising personal jurisdiction over an entity with successor liability because the predecessor corporations agreed to forum selection clauses).

The requirement that a federal court have personal jurisdiction "comes from the Due Process Clause's protection of the defendant's personal liberty interest." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 807 (1985).  This requirement is a "restriction on judicial power" that categorically seeks to protect individual liberty.  *See id.*  Because due process governs the limits of personal jurisdiction, courts must carefully consider whether due process would be violated by exercising personal jurisdiction over a party by way of successor liability.

With this in mind, the court finds that Plaintiff's justification for personal jurisdiction insufficient.  Plaintiff's reliance on *Aguas Lenders* is misplaced: that case stands for the proposition that a non-signatory successor in interest may be bound by a forum selection clause for purposes of claims of improper venue or forum non conveniens.  *See Aguas Lenders*, 585 F.3d at 700–01.  Plaintiff asks this court to extend the logic of *Aguas Lenders* from questions of venue to questions of personal jurisdiction.  To do so without considering due process factors would be incorrect.

The court in *Arcadia Biosciences, Inc. v. Vilmorin & Cie*, 356 F. Supp. 3d 379 (S.D.N.Y. 2019) aptly explained why extending the logic of *Aguas Lenders* from a question of venue to a question of personal jurisdiction is improper.  "The rules governing [venue and forum non conveniens] motions are driven primarily by concerns for the 'convenience of litigants and witnesses,' as well as by a range of 'private and public interests.'"  *Id.* at 394 (citations omitted).  By contrast, the rules governing personal jurisdiction "are driven by constitutional concerns over 'the court's power to exercise

control over the parties.'" *Id.* (citing *Leroy v. Great W. United Corp.*, 443 U.S. 173, 180 (1979)).  The personal jurisdiction inquiry "is constrained in ways that the venue inquiry is not," because the plaintiff must make a baseline showing that the defendants have certain minimum contacts with the forum "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice."  *See id.* (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

Therefore, due process principles "caution against a liberal application of forum selection clauses to non-signatory defendants" for the purposes of exercising personal jurisdiction.  *See id.* at 395; *see also Lelchook v. Societe Generale de Banque au Liban SAL*, 67 F.4th 69, 75 n.7 (2d Cir.) ("Plaintiffs' contention that SGBL is subject to personal jurisdiction under the 'substantial continuity' doctrine is unpersuasive . . . the doctrine relates to a successor's liability, not to personal jurisdiction").

With this in mind, the court will only exercise personal jurisdiction over Defendants by way of successor liability if it finds that there are minimum contacts between the forum and the Corporate Defendants' alleged predecessor, Overwatch Defense.

Plaintiff argues that there are minimum contacts principally because Overwatch Defense interacted "repeatedly" with Plaintiff's Connecticut-based CEO, and because Plaintiff previously brought a lawsuit against Overwatch Defense in this court.  *See* Mem. of Law in Opp'n at 4–5.  Plaintiff's CEO negotiated terms of the NDA, CTA, and the failed licensing agreement from his home office in Sandy Hook, Connecticut and performed "nearly all of his obligations" under those contracts in Connecticut.  *See id.*  Additionally, Plaintiff filed a lawsuit in this court against Overwatch Defense which that before either party filed substantive motions.  *See Ascent AeroSystems Inc. v. Overwatch Defense*

*LLC*, Civil Action No. 3:19-cv-00210 (KAD), (D. Conn. Feb. 12, 2019). Plaintiff thus argues that the Corporate Defendants "purposefully availed themselves of the privileges and protections of Connecticut law" by participating in "extensive negotiations and legal proceedings." *Id.* at 6.

Overwatch Defense's interactions with Plaintiff's CEO do not amount to the requisite minimum contacts to satisfy due process. First, Overwatch Defense's negotiations with Plaintiff's CEO for the NDA, CTA, and failed licensing agreement do not indicate that it was seeking "the benefits and protections of the forum's laws." *Burger King Corp.*, 471 U.S. at 376. Overwatch Defense negotiated contracts governed under New York law, with a Delaware company whose principal place of business was in New York State. Mem. of Law at 14–15. Overwatch Defense's ongoing communications with Plaintiff's CEO in Connecticut merely reflects "the technological ease of doing so" as opposed to a "'deliberate' intent to seek the benefits of the laws of Connecticut." *See Lee v. Golaszewski*, No. 3:23-CV-400 (OAW), 2023 WL 7497103, at *7 (D. Conn. Nov. 13, 2023) (citing *Vertrue Inc. v. Meshkin*, 429 F. Supp. 2d 479, 495–96 (D. Conn. 2006)).

Similarly, the 2019 legal proceedings do not support the finding that Overwatch Defense deliberately sought to avail itself of Connecticut's legal system. Plaintiff, not Overwatch Defense, initiated the action. Mem. of Law in Opp'n at 5. Plaintiff argues that there "was no suggestion that Connecticut was the wrong forum for that dispute." *Id.* This is the case not because Connecticut was the correct forum, but rather because the action was voluntarily dismissed before Overwatch Defense filed a response to Plaintiff's complaint. *See generally Ascent Aerosystems Inc. v. Overwatch Defense LLC*, No. 3:19-cv-00210-KAD (D.Conn. Feb. 12, 2019).

Overwatch Defense does not have minimum contacts with Connecticut, therefore it would offend "traditional notions of fair play and substantial justice" to exercise personal jurisdiction over the defendants by virtue of their relation to Overwatch Defense.  *See Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (citation omitted).

This conclusion applies equally to the Individual Defendants.  Plaintiff argues that there is personal jurisdiction over Defendant Hill and Defendant Michael because they "engaged in deliberate and targeted business dealings with Ascent, including with Ascent's CEO who was located in Connecticut at all relevant times."  Mem. of Law in Opp'n at 7.  As discussed, communications directed towards one Connecticut employee in this context does not amount to sufficient contacts.  The court thus concludes that it cannot exercise personal jurisdiction over Defendant Hill and Defendant Michael either.

In light of the foregoing, the court will consider whether transfer under 28 U.S.C. § 1406(a) is in the interest of justice.  "The interest of justice is served when a case is transferred from a forum where there is a difficult question of personal jurisdiction to a district in which personal jurisdiction is clearly established."  *WorldCare Corp.*, 767 F. Supp. 2d at 365 (citing *Danuloff v. Color Ctr.*, No. 93-CV-73478-DT, 1993 WL 738578, at *6 (E.D. Mich. Nov. 22, 1993)).  Thus, the court will determine whether venue is proper and personal jurisdiction over Defendants exists in the Northern District of New York.

**B.  <u>Personal Jurisdiction in the Northern District of New York</u>**

"Personal jurisdiction of a federal court over a non-resident defendant is governed by the law of the state in which the court sits—subject, of course, to certain constitutional limitations of due process."  *Robinson v. Overseas Mil. Sales Corp.*, 21 F.3d 502, 510 (2d Cir. 1994); *see also* Fed. R. Civ. P. 4(k)(1).  Thus, courts must engage in a two-step

inquiry.  *Chloé v. Queen Bee of Beverly Hills*, *LLC*, 616 F.3d 158, 163 (2d Cir. 2010). First, the court determines whether the forum state's long-arm statute confers jurisdiction over the defendant.  *Id.*  Second, if jurisdiction is permissible under the state's statute, the court must determine whether the exercise of jurisdiction comports with due process under the Fourteenth Amendment.  *Id.*

New York's long-arm statute allows a court to exercise specific personal jurisdiction over an entity which "transacts any business within the state or contracts anywhere to supply goods or services in the state."  N.Y. C.P.L.R. 302(a)(1).  To establish jurisdiction under 302(a)(1), a court must evaluate "(1) whether the defendant 'transacts any business' in New York and, if so, (2) whether this cause of action 'aris[es] from' such a business transaction."  *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 246 (2d Cir. 2007) (citing *Deutsche Bank Sec., Inc. v. Montana Bd. of Invs.*, 7 N.Y.3d 65, 71, (2006)).

Next, during the due process inquiry, a court evaluates the "quality and nature," of a defendant's contacts with the forum under a totality of the circumstances test.  *See id.* (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)).  The key question is whether the defendant "purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws."  *Burger King*, 471 U.S. at 474–75.

### 1.  *Overwatch Defense*

As a threshold matter, personal jurisdiction over the Corporate Defendants is dependent on whether the court would have had personal jurisdiction over the now-dissolved company Overwatch Defense, through a theory of personal jurisdiction through

successor liability.[2]  Accordingly, the court first will evaluate whether the Northern District of New York would have had personal jurisdiction over Overwatch Defense.

A party is considered to have "transact[ed] business" in New York if it engaged in purposeful activities through which it availed itself of the privilege of conducting activities within the state, thereby invoking the protections and benefits of New York's laws.  *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 169 (2d Cir. 2010).  In cases sounding in breach of contract, the Second Circuit has identified four factors to guide this inquiry:

> (i) whether the defendant has an on-going contractual relationship with a New York corporation; (ii) whether the contract was negotiated or executed in New York and whether, after executing a contract with a New York business, the defendant has visited New York for the purpose of meeting with parties to the contract regarding the relationship; (iii) what the choice-of-law clause is in any such contract; and (iv) whether the contract requires franchisees to send notices and payments into the forum state or subjects them to supervision by the corporation in the forum state.

*Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 22 (2d Cir. 2004) (citation omitted).

Here, Overwatch Defense entered into a teaming agreement governed by New York law with Plaintiff, whose principal place of business was in Syracuse, New York. Mem. of Law at 14–15.  Thus, the first and third factor weigh in favor of finding personal jurisdiction.  *See Sirius XM Radio Inc. v. Aura Multimedia Corp.*, No. 121CV06963 (GHW) (SDA), 2022 WL 18587769, at *4 (S.D.N.Y. July 18, 2022), *report and recommendation adopted*, No. 1:21-CV-06963-GHW, 2023 WL 243615 (S.D.N.Y. Jan. 17, 2023) (interpreting a "New York corporation" to include an entity whose principal place of business was in New York).  Crucially, a contract's "choice of law clause is a significant factor in a personal jurisdiction analysis because the parties, by so choosing, invoke the

---

[2] The specifics of establishing personal jurisdiction through successor liability are discussed below, in subsection III.A.2.

benefits and protections of New York law." *Sunward Elecs., Inc.*, 362 F.3d at 23 (citation omitted).

The second factor also weighs in favor of personal jurisdiction, because Overwatch Defense's CEO and founder, Defendant Hill, along with Defendant Michael, travelled to Syracuse, New York in October 2018 to meet with Plaintiff's leadership in furtherance of the teaming agreement. *See* Mem. of Law at 14. As to the fourth factor, while there is no evidence that the CTA required Overwatch Defense to send notices or payment to the forum state, according to Defendant Hill, Overwatch Defense engaged in extensive communications "via telephone or video conference" with Ascent personnel in New York, in furtherance of the agreement. First Decl. of Hill ¶ 15. Accordingly, Overwatch Defense engaged in purposeful activities in New York, invoking the protections and benefits of New York law, by entering the CTA with Plaintiff.

The next question is whether the current action "arises from" Overwatch Defense's business transaction in New York. *Sirius XM Radio Inc.*, 2022 WL 18587769, at *2. The answer is unequivocally yes. Plaintiff alleges that Overwatch Defense breached the CTA by misappropriating Plaintiff's confidential trade secret information, and that the Corporate Defendants are successors in interest to Overwatch Defense and therefore are liable for the violation. Compl. ¶¶ 56–61. Plaintiff further claims that the Individual Defendants are liable for breach of the CTA through equitable principles of veil piercing. *Id.* ¶¶ 62–66.

Finally, the court must evaluate whether the exercise of personal jurisdiction over Overwatch Defense would comport with due process by evaluating the quality and nature of its contacts with New York. Overwatch Defense had extensive contacts with New York throughout its partnership with Plaintiff. It agreed to a teaming agreement with Plaintiff,

then a Delaware corporation with a principal place of business in Syracuse, New York. Mem. of Law at 14–15. The agreement was governed by the laws of New York. CTA at 5. In his capacity as the sole owner of Overwatch Defense, Defendant Hill sent information in furtherance of the teaming agreement "to Fuchs and the Meringers . . . in Syracuse, New York." *See* First Decl. of Hill ¶ 15. While the CTA was in effect, he "did all [his] work of reviewing and sending emails with Ascent personnel from Florida, while communicating via telephone or video conferencing with Fuchs and other Ascent personnel in Syracuse, New York." *Id.* ¶ 20.

The quality and nature of Overwatch Defense's contacts with New York support the conclusion that it "purposefully avail[ed] itself of the privilege of conducting activities" in New York, and "invoke[ed] the benefits and protections of its laws." *Burger King*, 471 U.S. at 474–75. Accordingly, the court finds that Overwatch Defense would have been subject to specific personal jurisdiction in New York.

## 2. *Corporate Defendants*

Plaintiff alleges that the Corporate Defendants are successors to Overwatch Defense for the purposes of personal jurisdiction. Mem. of Law in Opp'n at 15. In *LiButti v. United States*, 178 F.3d 114 (2d Cir. 1999), the Second Circuit recognized that "when a person is found to be a successor in interest" to a party over which the court has jurisdiction, "the court gains personal jurisdiction over [the successor] simply as a consequence of their status as a successor in interest, without regard to whether they had any other minimum contacts with the state." *Libutti*, 178 F.3d at 123. There, the court applied New Jersey law to analyze whether Margaux Stallions, a party that lacked minimal contacts with the forum, was a successor in interest to Lion Crest Stable, a party

17

subject to the court's personal jurisdiction.  *See id.* at 124.  It found that, because Margaux Stallions was not "a successor in interest" to Lion Crest Stable, Margaux Stallions was not subject to personal jurisdiction of the court.  *See id.* at 124–125 (contrasting with other cases in which "the non-resident who was subjected to personal jurisdiction met one of these [successor liability] exceptions.").

Thus, to establish whether the court may exercise personal jurisdiction over the Corporate Defendants, the court must analyze whether the Corporate Defendants are successors in interest to Overwatch Defense under New York law.  *See id.* at 124 ("Successor liability is a question of State law").  If they are, then there is personal jurisdiction over the Corporate Defendants.

Under New York Law, there are four common categories in which a successor corporation may be held liable for the obligations of its predecessor: "(1) it expressly or impliedly assumed the predecessor's tort liability, (2) there was a consolidation or merger of seller and purchaser, (3) the purchasing corporation was a mere continuation of the selling corporation, or (4) the transaction is entered into fraudulently to escape such obligations."  *N. Star IP Holdings, LLC v. Icon Trade Servs., LLC*, 710 F. Supp. 3d 183, 204 (S.D.N.Y. 2024) (citing *New York v. Nat'l Serv. Indus., Inc.*, 460 F.3d 201, 209 (2d. Cir. 2006)).  Here, Plaintiff argues that there is successor liability under several theories: the Corporate Defendants collectively are a mere continuation of Overwatch Defense, there was a de facto merger between Overwatch Defense and the Corporate Defendants, and finally, the Corporate Defendants were established for fraudulent purposes.  Pl.'s Mot. for Prelim. Inj. 15–17, ECF No. 8-2.

The court concludes that Plaintiff has stated a claim for successor liability under the de facto merger doctrine. Under New York law, the criteria of a de facto merger are "(1) continuity of ownership; (2) cessation of ordinary business by the predecessor; (3) assumption by the successor of liabilities ordinarily necessary for continuation of the predecessor's business; and (4) continuity of management, personnel, physical location, assets, and general business operation." *Time Warner Cable, Inc. v. Networks Grp., LLC*, No. 09 CIV 10059 DLC, 2010 WL 3563111, at *6 (S.D.N.Y. Sept. 9, 2010) (citation omitted). Crucially, the court must analyze these factors in a flexible manner, "that disregards mere questions of form," and instead asks "whether, in substance, it was the intent of the successor to absorb and continue the operation of the predecessor." *Time Warner Cable*, 2010 WL 3563111, at *6 (citation omitted).

Plaintiff alleges at least three hallmarks of a de facto merger. First, Plaintiff claims that there is continuity in management because Defendant Hill and Defendant Michael "owned and controlled Overwatch Defense," and they subsequently founded Overwerx and established Overwatch Aerospace LLC and Overwatch Aerospace Ltd. as wholly owned subsidiaries. *See* Pl.'s Mot. for Prelim. Inj. at 16. Defendants dispute this characterization, maintaining that Overwerx was Michael's project, with limited, if any, involvement from Defendant Hill. However, the court notes that it is undisputed that Hill was involved in founding Overwerx, was a shareholder, and was labeled an "Individual Person with Significant Control" in Overwerx's U.K. certificate of incorporation. *See* Overwerx Certificate of Incorporation, Ex. P at 12, ECF No 8-20. Moreover, Defendant Hill was a manager of Overwatch Aerospace LLC and consultant involved in securing award of patents in the United States. First Decl. of Michael ¶¶ 8, 134.

Second, Plaintiff alleges there is "continuity of shareholders" because Defendant Hill was sole owner of Overwatch Defense, and then held between 25 and 50% of shares in Overwerx.  Overwerx Certificate of Incorporation at 12; *see also* ECF Nos. 8-25 at 5.

Third, Plaintiff demonstrates there were continuity of business operations and assets.  Pl.'s Mot. for Prelim. Inj. at 16.  According to Defendants, Overwatch Defense was nothing more than a "patent start up," Mem. of Law at 19, and it ultimately assigned its patents to Overwerx for development by its subsidiary Overwatch Aerospace, Ltd., *see* Pl.'s Mot. for Prelim. Inj. at 16.  Defendant Michael's affidavit supports the conclusion that Overwerx shared Overwatch Defense's purpose of "develop[ing] a commercially viable drone loiter munition system."  *See* First Decl. of Michael ¶ 116.  Overwatch Aerospace Ltd. was also enmeshed in pursuit because it was the operating company that developed the "technology necessary to make a commercially viable product" from the Overwatch Defense patents.  *See id.* ¶ 135.  These entities shared a common goal and shared intellectual property assets in Defendant Hill's patents.

Finally, Plaintiff alleges the cessation of ordinary business of the predecessor entity because Overwatch Defense dissolved within one year of Overwerx's founding. Pl.'s Mot. for Prelim. Inj. at 9–10.

Accordingly, the court concludes that Overwerx and its wholly owned subsidiaries Overwatch Aerospace Ltd. and Overwatch Aerospace LLC are successors in interest to Overwatch Defense for the purposes for personal jurisdiction.  *Time Warner Cable*, 2010 WL 3563111, at *6 (courts analyze successor liability "in a flexible manner that disregards mere questions of form").

### 3. *Individual Defendants*

20

Turning to the Individual Defendants, the court first addresses Defendant Hill. Defendants argue that "[a]ny contacts initiated by Overwatch Defense and Overwatch Optics cannot be attributed to Hill in his individual capacity" unless the court pierces the corporate veil.  ECF No. 76 at 12–13.  This is incorrect because New York's long-arm statute "confers jurisdiction over individual corporate officers who supervise and control an infringing activity," without piercing the corporate veil.  *Chloé*, 616 F.3d at 164; *see also Retail Software Servs. Inc. v. Lashlee*, 854 F.2d 18, 22 (2d Cir. 1988) (upholding long-arm jurisdiction over employee who was a "primary actor" in New York transaction that led to litigation (citing *Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 470 (1988))).

There are sufficient allegations of fact to establish that New York's long-arm statute applies to Defendant Hill.  Personal jurisdiction over an individual employee of a non-domiciliary corporation under N.Y. C.P.L.R. 302(a)(1) is appropriate where the out-of-state corporate officer was a "primary actor[] in the transactions in New York that gave rise to the litigation, and not merely some corporate employee[] who ... played no part in it."  *Sea Tow Servs. Int'l, Inc. v. Pontin*, 472 F. Supp. 2d 349, 361 (E.D.N.Y. 2007) (citation and quotation omitted).  Here, Plaintiff claims that Overwatch Defense breached the CTA, first by failing to return Ascent's proprietary technology and second, by assigning U.S. Patent Application No. 16/153,696 to Defendant Overwerx, in furtherance of a scheme to misappropriate Plaintiff's proprietary technology.  *See* Compl. ¶¶ 43–46, 49.  The court can reasonably conclude that Defendant Hill was a primary actor in the alleged infringing activity: Defendant Hill was the founder, CEO, and sole owner of Overwatch Defense. First Decl. of Hill ¶ 10; Mem. of Law at 19.  His near-exclusive authority over Overwatch Defense suggests that Hill exercised extensive control over the company, had knowledge

of and consented to any activity Overwatch Defense engaged in, and benefitted from any of Overwatch Defense's activities as its sole owner.  Thus, New York's long-arm statute applies to him.  *See EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, 844 F.3d 79, 98 (2d Cir. 2016) (affirming district court's attribution of contacts of corporation to individual defendant who was founder and CEO of corporation).

Moreover, Defendant Hill's own contacts with the forum satisfy due process.  Of his own initiative, Hill reached out to Plaintiff (a New York company) to establish a business relationship.  Compl. ¶ 32.  According to Hill, "as far [as he] was concerned, [he and Overwatch Defense] were dealing with a company whose venue was in New York." Third Decl. of Hill ¶ 8, ECF No. 62-5.  Further, after signing the CTA, which was governed under the laws of New York, "[i]nformation exchanges between [Overwatch Defense] and Ascent," were directed from Hill to Plaintiff "in Syracuse, New York."  *See* First Decl. of Hill ¶ 15.  These communications from Hill took place over the course of fourteen months. *Id.*  Additionally, Defendant Hill travelled to Syracuse, New York in October 2018 to meet with Plaintiff's leadership in furtherance of the CTA.  *See* Mem. of Law at 14.  Exercising jurisdiction over Hill does not offend due process under the Fourteenth Amendment because he "purposefully avail[ed]" himself "of the privilege of conducting activities" within New York, and invoked the benefits and protections of its laws.  *See Burger King*, 471 U.S. at 474–75.

Next, the court evaluates whether there is personal jurisdiction over Defendant Michael.  Defendant Michael was the Chief Operating Officer of Overwatch Defense, Compl. ¶ 14, though he claims that this "was a title in name only," First Decl. of Michael ¶ 25.

22

In contrast to Defendant Hill, Defendant Michael does not have sufficient contacts with New York to satisfy due process. Plaintiff alleges that he "played an active role in negotiations and key communications" with Plaintiff during the teaming agreement. *See* Mem. of Law in Opp'n at 7–8. Indeed, he visited Plaintiff's leadership in New York in 2018. Mem. of Law at 14. But without more, the court cannot conclude that Defendant Michael purposefully availed himself of the benefits and protection of New York's laws. Plaintiff highlights that its CEO "worked closely" with Defendant Michael, "which included agreeing to and arranging for [Plaintiff] to provide" drones and 3D models of drones to him. *Id.* at 5. Yet as Plaintiff has repeatedly highlighted, its CEO was based out of Connecticut, not New York, which only diffuses the potency of Michaels contacts as COO. *Id.*

Accordingly, this action could not be brought against Defendant Michael in the Northern District of New York, and he should be removed from this matter.

### C. Venue

Venue in the Northern District of New York is proper under 28 U.S.C. § 1391(b)(2) because "a substantial part of the events or omissions giving rise to the claim occurred" there. When considering proper venue in breach of contract claims, courts look to where the contract was negotiated, executed, where it was to be performed, or where it was breached. *Michaels v. Drexler*, No. 20-CV-1776 (RA), 2020 WL 6825692, at *3 (S.D.N.Y. Nov. 20, 2020). Here, Plaintiff performed substantial parts of its obligations under the CTA in the Northern District of New York because its principal place of business was in Syracuse, New York. CTA at 1. The court can therefore conclude that a "substantial part of the events" giving rise to the claims occurred in the Northern District of New York. *See*

*Drexler*, 2020 WL 6825692, at *3 (finding venue appropriate where Plaintiff alleged that he performed "substantial components of his contractual obligations").

The court next considers the convenience factors weighed when deciding whether to transfer to an alternative forum: "(1) the plaintiff's choice of forum, (2) the convenience of witnesses, (3) the location of relevant documents and relative ease of access to sources of proof, (4) the convenience of parties, (5) the locus of operative facts, (6) the availability of process to compel the attendance of unwilling witnesses, [and] (7) the relative means of the parties." *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 106–07 (2d Cir. 2006) (citation omitted). "[C]onvenience and fairness are considered on a case-by-case basis" and the court has "broad discretion in making determinations of convenience." *Id.*

A review of the parties' submissions makes clear that transfer to the Northern District of New York, rather than transfer to the Middle District of Florida or dismissal, would serve "the interest of justice." The Second Circuit has found that the "interest of justice" favors a "forum chosen by an aggrieved party." *See Newsweek, Inc. v. U.S. Postal Serv.*, 652 F.2d 239, 243 (2d Cir.1981). Here, while Plaintiff initially chose the District of Connecticut, it "does not oppose" transfer to the Northern District of New York, ECF No. 74 at 2, and agrees that "it is an appropriate forum for transfer." ECF No. 77 at 8.

Next, the locus of operative facts arises out of Plaintiff's business relationship with Defendant Hill and Overwatch Defense. Defendants acknowledged that the Northern District of New York is one of the "best candidates" for venue in this matter. *See* Mem. of Law at 26. As Defendant Hill emphasized, Overwatch Defense was "agreeing to do

business in New York" when it partnered with Ascent.  Third Decl. of Hill ¶12.  Under the CTA, communications about research, product development, and testing was directed to and from Plaintiff's principal place of business in Syracuse, New York.  *See* First Decl. of Hill ¶ 15; Third Decl. of Hill ¶¶ 4-7.  The locus of operative facts is a "primary factor," in a venue transfer analysis, thus this factor weighs heavily in favor of transfer to New York. *See Fuji Photo Film Co. v. Lexar Media, Inc.*, 415 F. Supp. 2d 370, 375 (S.D.N.Y. 2006).

Additionally, the NDA and CTA are governed by New York law.  CTA at 5; NDA at 4.  A federal court located in New York will be more familiar with its state's legal framework, which further supports transfer to New York as opposed to Florida.  *Unlimited Care*, 42 F. Supp. 2d at 333–34 ("[T]he Agreement is governed by the law of Massachusetts. Thus, the federal forum most familiar with the state law governing the contract would preside over the matter").

As to convenience of witnesses and parties, the Northern District of New York is no more inconvenient than the Middle District of Florida is to most Defendants.  Defendant Hill lives in Fredericksburg, Virginia, First Decl. of Hill ¶ 4, and Overwerx and Overwatch Aerospace Ltd. are based out of the United Kingdom, Mem. of Law at 1–3.[3]  Therefore, litigation in either the Northern District of New York or the Middle District of Florida would require most defendants to participate in transatlantic communications and travel.

Another factor to be considered is the relative means of the parties.  This factor is more significant when, as here, one party is an individual and the other is a corporation. *See 800-Flowers, Inc. v. Intercontinental Florist, Inc.*, 860 F. Supp. 128, 135 (S.D.N.Y. 1994).  The court does not doubt that Defendant Hill has fewer resources at his disposal

---

[3] While Overwatch Aerospace LLC is a Florida corporation, Defendants remind the court that it "is not active and . . . has no offices, assets, or employees."  ECF No. 76 at 22 n.11.

than the corporate Plaintiff.  However, the court does not see how litigating this matter in the Middle District of Florida—Defendants' preferred forum—would be less onerous to him than litigating in the Northern District of New York.  Consequently, this factor does not weigh in either party's favor.

Finally, transfer would serve the interest of justice because it would allow the transferee court to promptly address Plaintiff's pending application for injunctive relief. Plaintiff applied for a preliminary injunction in June 2024.  *See* ECF No. 8.  While this court may not enter a preliminary injunction against Defendants for lack of personal jurisdiction, it recognizes that additional delay may subject Plaintiff to irreparable harm. *Weitzman v Stein*, 897 F2d 653, 658 (2d Cir 1990) (before a court can enter a preliminary injunction against a litigant, it must be "clearly established" that the court has personal jurisdiction).

In sum, the interest of justice would be served by transfer to the Northern District of New York.  Personal jurisdiction over Defendants Overwatch Aerospace LLC, Overwatch Aerospace Ltd., Overwerx, and Defendant Hill exists in New York, and venue is proper there.

## IV.    CONCLUSION

Accordingly, it is thereupon **ORDERED AND ADJUDGED** as follows:

1. Defendant Michael is **TERMINATED** from this matter.  The Clerk of Court respectfully is asked to remove him from this action.

2. This action is *sua sponte* **TRANSFERRED** to the United States District Court for the Northern District of New York pursuant to 28 U.S.C. § 1406(a).  The Clerk of Court respectfully is directed to transfer this matter.

3.  Plaintiff's Motion for Status Conference, ECF No. 74, is **DENIED** as moot.

4.  Defendants' Motions to Seal, ECF No. 50, ECF No. 66, and ECF No. 72, are **GRANTED.**

5.  Plaintiff's Motions to Seal, ECF No. 58 and ECF No. 68, are **GRANTED.**

6.  Defendants' Motion to Strike, ECF No. 78, is **DENIED**.


**IT IS SO ORDERED** at Hartford, Connecticut, this 20th day of February, 2025.

_____/s/_____
OMAR A. WILLIAMS
UNITED STATES DISTRICT JUDGE